U~NITED~ S~TATES~ D~ISTRICT~ C~OURT~        S~OUTHERN~ D~ISTRICT OF~ T~EXAS~

| | | |
|---|---|---|
| Devon Energy Production Company, L.P., | § § § | |
| Plaintiff, | § § | |
| versus | § § | Civil Action H-08-1353 |
| American Int'l Specialty Lines Insurance Co., *et al.*, | § § § § | |
| Defendants. | § § | |

## Opinion on Summary Judgment

1.  *Introduction.*

    A gas well blew out and damaged surrounding property. The property owners sued the well operator, and they settled. The operator now seeks its defense and cleaning costs from its insurer, and it will prevail.

2.  *Background.*

    Devon Energy Production Company is the successor in interest to Seagull Energy Corporation. Seagull purchased a general commercial liability policy from American International Specialty Lines Insurance Company, covering December 1, 1993, to December 1, 1994.

    Seagull Mid-South – a subsidiary of Seagull that was named as the insured – operated the Hardman No. 2-6 in Bossier Parish, Louisiana. During the coverage, the well blew out on March 6, 1994. The blow out caused an adjacent, plugged well also to blow out, and it left liquid and particle debris on neighboring land and allowed fluids to contaminate other strata, especially aquifers.

    Devon defended and settled two suits for property damage from the blow out. Devon said that American had a duty to defend and indemnify it; now it seeks reimbursement for the costs of the suits and cleaning the site.

3.   *Defense.*

American's duty to defend at law is determined by the allegations in the pleadings and the language of the insurance policy. *Heyden Newport. Chem. Corp. v. Southern Gen. Ins. Col.*, 387 S.W.2d 22, 26 (Tex. 1965). The petitions in both lawsuits specify the blow out and damage to plaintiffs' land – surface and subsurface.

   A.   *Insured.*

American says that Devon is not covered by the policy. Two Devon employees have sworn to the corporate progression from Seagull Mid-South to Devon Energy Production. Devon Energy Production contains the former entities Seagull Energy E&P, Inc., Seagull Mid-South, Inc., Ocean Energy, Inc., and Devon Louisiana Corporation. Devon has submitted the merger documents. Devon is Seagull's successor in interest and has become the insured in the policy.

   B.   *Allocation.*

Next, American says that even if some of the damage in the underlying lawsuits is covered, Devon cannot recover because it has not distinguished between covered and uncovered damages.

American chose not to defend Devon. The settlement released all claims against Devon, covered and uncovered. It is impossible to say, afterwards, what percentage of the settlement was for covered claims. These suits were not adjudicated on the merits. If American wanted a formal determination of the allocation of damages, it had the opportunity to defend Devon.

   C.   *Timing.*

Last, American says that the damage did not occur during the policy. It is undisputed that the well blew out on March 4, 1994. American is liable for covered damages stemming from that explosion, even if it took time to affect the plaintiffs' land and water. Both complaints specify that the blowout caused damage. The blow out date determines coverage.

4.   *Indemnification.*

The actual facts that result in the insured's liability trigger the duty to indemnify. *Trinity Universal Ins. Co. v. Cowan*, 945 S.W.2d 819, 821-22 (Tex. 1997). The policy says that American will defend suits for property damage.

A.   *Pollution.*

American disclaims property damage from pollution, except if it was (a) accidental, (b) fixed in time, (c) known to the insured within seven days, (d) reported to American in writing twenty days after that, and (e) subjected to the insured's reasonable remedial efforts.

The policy also excludes coverage for (a) water pollution caused by oil or its derivatives and (b) cleaning premises the insured owns, rents, or occupies. In sum, the policy has general coverage for property damage, an exclusion for pollution, an exception to the pollution exclusion, and further exclusions to the exception.

B.   *Notice.*

Devon says it meets the five conditions allowing pollution coverage. The only one that American plausibly contests is the twenty-day notification. Devon offers the affidavit of its insurance broker, saying that he was notified in writing on March 11, 1994, and that it is his practice to forward it immediately to the underwriter. American says it never received notice.

Notice defects do not bar coverage. The policy is modified by the notice requirement in Texas that says that a failure to notify under *any part* of a policy will not bar its carrier's liability unless the delay prejudiced it. It also says that the failure of Devon's agent to notify American cannot affect coverage.

Even assuming American was not notified within twenty days, it has not shown how that adversely affected its interests. It cannot refute that Devon notified the agent on time, avoiding the pollution limitation. It says it did not get the notice; that is not the same as Devon's not timely notifying the agent.

C.   *Water pollution.*

Even when the pollution exclusion does not apply, the policy excludes coverage for water pollution caused by oil or its derivatives. American says that this means aquifer contamination is not covered. Water pollution and aquifer contamination are not the same thing. An aquifer is stratum of rock that conducts water beneath the surface. The aquifer contamination was not caused by oil. Mud and debris clogged the strata, which could have affected nearby water supplies. On the other hand, water pollution from oil and its derivatives refers to a spill of a finished product contaminating a surface body of water, not pre-production substances. Aquifer contamination, therefore, is not excluded by the policy.

Because the damages in the lawsuits are covered under the policy, American must indemnify Devon for the settlement.

5.   *Cleaning Costs.*

Devon hired BC Johnson Associates to review its damages claim. It says that it cost $3.9 million to clean the ground and rectify aquifer contamination. Devon says that the policy covers all of its costs. American says that the policy covers none of the costs; alternatively, it says that the policy only covers cleaning costs for damaged property that Devon diligently cleaned and did not own.

Devon purchased protection for underground resources and equipment hazard. This covers property damage to "oil, gas, water, or other mineral substances . . . not . . . reduced to physical possession above the surface of the earth, and any well, hole . . . or area . . ." used for "exploration for or production." This protection is parallel to that for water pollution caused by oil or its derivatives; it covers damage caused by the expulsion of raw substances onto another's land.

A.   *Diligence.*

The policy says that American will not be responsible for cleanup unless Devon promptly and diligently contains the problem. Devon stopped the blow out in five days. American has offered no evidence that Devon's response was anything other than diligent.

B.   *Mineral Rights.*

American also says that because Devon owned mineral rights in the damaged property, it fell within the exclusion of land that it was using. The words in the policy – "own, occupy, or rent" – refer to a conventional use of the surface estate. The owner of the full estate had conveyed a interest in the minerals. Although the details vary among the states' legal systems, they are in essence parallel, and they do not customarily include general use of the surface.

In Texas, the owner of a mineral interest has an ownership that is categorically distinct from the usual surface owner's interest. First, the utility of the mineral estate lies in its consumption by production rather than occupying them or the surface. Second, the mineral estate carries with it a limited occupancy interest in the surface. The mineral owner may use the surface as it is directly required for exploitation of the minerals. Third, the mineral owner may also consume surface and ground water as is directly required for the exploitation of the minerals. Also, the mineral estate is conveyed, despite its being called a lease, by a grant of a determinable fee in the minerals on the condition that minerals be produced.

In Louisiana, a mineral right is an incorporeal immovable. La. Rev. Stat. Ann.§ 31:18 (2008). It is a real property interest even though it lacks material form. Landowners can create three types of mineral rights: the servitude, the royalty, and the lease. *Id.* at § 31:16 (2008).

A mineral servitude is a right in the land owned by another to reduce minerals to possession and ownership. This right is similar to the common-law *profit a prendre*, which is a real right owned separately from the land. *See Steele v. Denning*, 456 So. 2d 992, 998 (La. 1984). The mineral owner may only use as much of the surface as is reasonably necessary for his operations. The royalty owner has no independent surface or executory interest.

A mineral lease is a contract between a producer and a landowner or mineral servitude owner, who owns the executive rights to the minerals under a tract of land. The producer gets the right to explore and develop the minerals. La. Rev. Stat. Ann. § 31:114 (2008). Like the owner of the mineral servitude, the producer must operate with reasonable prudence. *Id.* at § 31.122 (2008). As in Texas, he does not occupy the surface in the traditional sense.

Here, the damaged land was not being used in connection with the mineral development at all; it was neighboring land. When the Hardman No. 2-6 Alternate Well blew out, gas-charged mud, salt water, condensate, drilling fluids, and gas traveled laterally underground to the plugged wellbore of the Hardman No. 1. This stream of gas-pressurized fluids and particles shot into the air from the plugged well. The substances expelled from the well being drilled through the plugged well damaged the land and its aquifers around the old well.

The damaged land was owned by the petitioners in these suits: *Willimae Watts, et al. v. Seagull Mid-South, Inc.*, No. 90933, and *Charles Hardman, et al. v. Centerpoint Energy and Gas Transmission Company*, No. 110682, both in the 26th Judicial District Court for the Parish of Bossier. It was not owned or occupied by Devon.

Devon has not sought indemnity for damage to the well site or the aquifers it was using to drill the well. It does not "own, occupy, or rent" the property it cleaned. It will recover for the injury to the lands and aquifers of its neighbor that its blow out caused.

6. *Conclusion.*

Because the underlying lawsuits specify property damage covered by the policy, American will pay Devon's settlement and defense costs. Because the property damage is covered by the underground resources endorsement, American will pay Devon for its cleaning costs.

Signed on May 4, 2009, at Houston, Texas.

*signature*
Lynn N. Hughes   USDJ
United States District Judge